UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JIAN CHENG LIU and FUQIANG GAO, on
behalf of themselves and all others
similarly situated,

        *Plaintiffs*,

           -against-

KUENG CHAN, MAY TONG, SIMON CHAN,
FEN ZHEN CHEN a/k/a FENG ZHEN CHEN,
WING KEUNG ENTERPRISES, INC. d/b/a
WK FOODS, and WK TRUCKING LLC.
d/b/a WK FOODS,

        *Defendants*.
----------------------------------X

**MEMORANDUM & ORDER**

18-CV-05044(KAM)(SJB)

**MATSUMOTO, United States District Judge:**

        Plaintiffs initiated this suit on September 6, 2018, seeking to recover unpaid wages for alleged violations of federal and New York state labor laws. (ECF No. 1.) The original complaint was amended on September 13, 2018, and the plaintiffs filed a second amended complaint on February 15, 2019. (ECF No. 29, Second Amended Complaint ("SAC").) The SAC pursues class and collective relief for defendants' alleged labor law violations and adds five claims alleging fraudulent conveyances in violation of New York's Debtor and Creditor Law ("NY DCL").

        The defendants, with one exception, collectively moved to dismiss the SAC on July 18, 2019 pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* ECF No. 41-1, Defendants' Motion

to Dismiss and Motion to Strike: Memorandum of Law ("Defs.' Mot.").)  The following day, defendant Simon Chan served a separate motion to dismiss.  (ECF No. 42, Memorandum of Law in Support of Defendant Simon Chan's Motion to Dismiss ("Chan Mot.").)  Plaintiffs served corresponding opposition papers, (ECF No. 43, Memorandum of Law in Opposition to Defs.' Mot. ("Opp."); ECF No. 42, Memorandum of Law in Opposition to Chan Mot. ("Opp. (Chan)")), and defendants served their replies. (ECF No. 46, Defs.' Reply; ECF No. 44, Chan Reply.)

For the reasons set forth below, the court grants the defendants' motions in part and denies the motions in part.

**BACKGROUND**

The following facts are drawn exclusively from plaintiffs' complaint, which the court presumes to be true for purposes of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006) (citing *Allaire Corp. v. Okumus,* 433 F.3d 248, 249-50 (2d Cir. 2006)) (for a 12(b)(6) "motion, we are constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor.").

**I.   The Parties**

Wing Keung Enterprises, Inc. d/b/a WK Foods ("Wing Keung") was formed in New York on May 2, 2001.  (SAC ¶ 8.)  Wing

Keung operated as a wholesale business in Flushing, New York for over 15 years before moving to Hicksville, New York in 2017. (*Id.* ¶¶ 9-10.) WK Trucking, LLC d/b/a WK FOODS ("WK") is a New York trucking company that was formed in May 2017. (*Id.* ¶¶ 11-12.)[1] Two weeks before WK was formed, a judgment was entered against Wing Keung and Kueng Chan in *Chaohui Tang v. Wing Keung Enters., Inc.*, Case No. 14-cv-390 (E.D.N.Y.) ("Tang Litigation"). (*Id.* ¶ 13.) WK is "related to the other Defendant business entities," and according to New York government databases, maintains addresses in College Point, New York and Whitestone, New York that are associated with other defendants, including Wing Keung and Kueng Chan. (*Id.* ¶¶ 12, 14-15.) Wing Keung and WK are alleged to have disregarded corporate formalities and commingled certain of their finances. (*Id.* ¶¶ 46-47, 50.)

Kueng Chan is the Chief Executive Officer of both Wing Keung and WK. (*Id.* ¶ 27.) Kueng Chan maintains control, oversight and direction over the operation of the businesses, including their employment and pay practices. (*Id.* ¶ 28.) He and his wife, defendant May Tong, each own a 50% interest in Wing Keung, though he is the sole owner of WK. (*Id.* ¶¶ 29-30.) May Tong is the "boss lady," and is involved in the management

---

[1] Defendants state that WK Trucking LLC is erroneously named as WK Trucking LLC d/b/a WK FOODS. (Defs.' Mot. 1.)

of Wing Keung and WK.  (*Id.* ¶ 33.)  Tong is responsible for
"overlooking employees' work schedules, compensation, and
defendants' pay and recordkeeping practices."  (*Id.* ¶ 35.)
Simon Chan is the son of Kueng Chan and May Tong.  (*Id.* ¶ 36.)
Chan managed and "oversaw defendants' daily business activities
in general as an officer and the General Manager."  (*Id.* ¶ 37.)
Feng Zhen Chen, "Defendants' other General Manager," likewise
managed and oversaw the defendants' daily business activities in
general, and directly supervised Plaintiffs' work."  (*Id.* ¶¶ 42-
43.)

Plaintiff Jian Chen Liu has been employed by Wing
Keung since November 18, 2009, first performing miscellaneous
work, and then driving trucks.  (*Id.* ¶ 74.)  Liu's co-plaintiff,
Fuqiang Gao, has been employed as a driver by Wing Keung since
March 7, 2017.  (*Id.* ¶ 81.)

## II.  Prior Actions Against Defendants

Wing Keung, Kueng Chan, and May Tong were previously
subject to adverse judgments for labor violations in the Eastern
District of New York.  (SAC ¶¶ 16-17.)  On May 16, 2017, in the
Tang Litigation, Judge Weinstein entered an Order and Judgment
against Wing Keung and Kueng Chan, awarding plaintiffs a sum of
$525,419.04 with post-judgment interest.  (*Id.* ¶¶ 18-19; *see
also* ECF No. 29-1, Order and Judgment dated May 16, 2017 ("Tang
Judgment").)  On August 6, 2018, in *Kong v. Wing Keung Enters.,*

*Inc.*, Case No. 15-cv-6228 (E.D.N.Y.) ("Kong Litigation"),

Magistrate Judge Bloom entered a judgment of liability against

Wing Keung, Kueng Chan, and May Tong, jointly and severally, in

the amount of $800,000.  (SAC ¶¶ 20-21; *see also* ECF No. 29-2,

Order and Judgment dated Aug. 6, 2018 ("Kong Judgment").)[2]

Plaintiffs urge the court to take judicial notice of the Tang

and Kong Judgments, which the court may, and will do.  *See* Fed.

R. Evid. 201.

### III.   Fraudulent Recordkeeping Practices

Starting "[a]t least several years ago," defendants

began to use facial recognition and fingerprint technology to

generate false employment records to evade labor law

requirements.  (SAC ¶ 53.)  Defendants maintained the authentic

payroll records separately from the false employment records.

(*Id.* ¶ 54.)  Defendants compelled their employees, who generally

lacked command of the English language, to sign fraudulent

payroll calculations, which were used to protect defendants from

labor law claims.  (*Id.* ¶ 55.)  Defendants Simon Chan, Kueng

Chan, May Tong, and a non-defendant bookkeeper, Grace Wong,

played pivotal roles in defendants' improper recordkeeping

practices.  (*Id.* ¶ 57.)  Simon Chan managed defendants' payroll

department and helped his parents set up and maintain the

---

[2]     The parties in the *Kong Litigation* consented to Judge Bloom's
jurisdiction.  (*See* Case No. 15-cv-6228, ECF No. 82.)

payroll records, create defendants' fraudulent "employment records," and review and finalize the employees' timesheets. (*Id.* ¶¶ 59-61.)  Grace Wong then presented the falsified timesheets to the employees.  (*Id.* ¶ 62.)

## IV.  The Fraudulent Conveyances

After plaintiffs filed suit on September 6, 2018, May Tong approached plaintiff Jian Cheng Liu, in an attempt to convince him to drop the case.  (SAC ¶¶ 66-67.)  Mr. Liu recorded the conversation, and the complaint appends an unauthenticated transcript purporting to memorialize May Tong's conversation with Mr. Liu.  (*See id.* ¶ 68; ECF No. 29-3, Tong Tr.)  The transcript reflects that Tong told Liu that defendants had transferred assets and rendered themselves judgment proof:

> Regarding this case, we have already transferred all our assets and none of them is under my name. Even if you won the case in the end, you could only win reputation. . . .  But I have transferred all the assets to other people and Lao Da. . . . If I don't have anything in the United States, what are you suing me for? . . . I have already transferred the assets and I have nothing left.

(Tong Tr. 1.)  Plaintiffs allege that Lao Da is an alias of defendant Feng Zhen Chen.  (SAC ¶ 71.)  Plaintiffs assert that Tong's statements regarding the transfer of assets "likely also refers" to the sale of a New York home in the summer of 2017. (*Id.* ¶ 72.)

## V.  Labor and Wage Practices

When Liu began driving for Wing Keung, a date not specified in the complaint, he was paid $2,400 a month.  (SAC ¶ 75.)  Liu's compensation was raised over some period of time, likewise unspecified, until his salary reached $3,300 a month. (*Id.*)  In "early 2017," Liu's compensation was changed to $800 a week, and "sometime later," to $825 per week.  (*Id.* ¶ 76.)  This pay did not account for Sundays.  (*Id.* ¶ 77.)  On Sundays, Liu was paid $80 a day, and "at a later time," $100 a day.  (*Id.* ¶ 77.)  Liu "worked 7 days a week until about February, 2017, then 6 days a week thereafter."  (*Id.* ¶ 78.)  During Liu's employment, he worked in excess of 85 hours per week during weeks in which he worked all seven days, and worked over 75 hours per week during weeks in which he worked six days.  (*Id.* ¶ 79.)  Liu worked over 40 hours each week except from May 6-19, 2017, and July 1-28, 2017.  (*Id.* ¶ 80.)

Gao was "sometimes" paid at a "flat rate" of $800 per week, without regard to the overall number of hours he worked. (*Id.* ¶ 83.)  On certain weeks, not specified in the complaint, Gao was paid less than $800 a week.  (*Id.* ¶ 84.)  On these occasions, the "management" would promise to make up the shortfall the following month.  (*Id.*)  "He worked 6 days a week, over 75 hours a week," and also worked over 40 hours each week, except from June 16, 2018 to July 12, 2018.  (*Id.* ¶¶ 85-86.)

Plaintiffs claim that defendants willfully failed to pay each plaintiff overtime pay for hours worked beyond 40 hours in a workweek; failed to provide plaintiffs with written notice of their regular rate of pay or overtime rate of pay; and failed to provide each plaintiff with accurate paystubs and W-2s.  (*Id.* ¶¶ 91-93.)  The plaintiffs were also generally deprived a set meal time, even though defendants' records showed 30 minutes of meal time.  (*Id.* ¶ 87.)

## VI.  Causes of Action

Claims One and Two of the SAC allege that defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), and New York Labor Law ("NYLL"), N.Y. Comp. Codes R. & Regs. ("NYCCRR") tit. 12, § 142-2.2.  (*Id.* ¶¶ 109-120.)  Claim Three alleges that defendants violated §§ 190 and 650 of the NYLL, along with New York State Department of Labor regulation § 146-1.6, by not paying plaintiffs an extra hour's pay for every that they worked in excess of ten hours.  (*Id.* ¶¶ 121-23.)  Claim Four asserts that defendants willfully violated New York's Wage Theft Prevention Act ("WTPA") by failing to provide plaintiffs with annual wage notices and weekly wage statements. (*Id.* ¶¶ 124-28.)

Claim Five asserts a claim for "Fraudulent Conveyance," though the paragraphs under the applicable heading do not clarify what statutory authority underlies the cause of

action.  (*Id.* ¶¶ 129-34.)  Claims Six through Nine allege that defendants violated NY DCL §§ 273 through 276 by "convey[ing] their assets to Defendant Fen[g] Zhen Chen and/or third-parties without fair consideration."  (*Id.* ¶¶ 135-50.)

**VII.  The Motions**

Defendants attack plaintiffs' overtime claims under the FLSA and NYLL for failure to identify a specific workweek in which they worked over forty hours.  (Chan Mot. 10-11; Defs.' Mot. 5-6.)  Relatedly, defendants assert that plaintiffs' spread of hours allegations under Claim Three fails to pinpoint a specific day on which plaintiffs worked more than ten hours. (Defs.' Mot. 6.)  Next, defendants urge the court to dismiss plaintiffs' WTPA claim because Liu's employment commenced in 2009, two years before the WTPA's annual wage-notice requirement became effective.  (*Id.* 7; Chan Mot. 12.)  In addition, Gao commenced employment in 2017, two years *after* the annual wage-notice requirement was removed from the NYLL.  (Chan Mot. 12.)

Finally, defendants maintain that that the SAC's fraudulent conveyance claim cannot survive dismissal because plaintiffs fail to allege either the amount or manner of the purported transfer(s) by defendants, and also because plaintiffs fail to plead the specific property, timing, or consideration paid with respect to the purported transfers.  (Chan Mot. 7-9; Defs.' Mot. 7-12.)

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is facially plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not contain detailed factual allegations, but must contain more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" or "naked assertions" devoid of "further factual enhancement." *Id*. Although Rule 8 of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2d Cir. 2001) (internal quotation omitted). For motions under Rule 12(b)(6), the court assumes the truth of all well-pleaded facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 78 n.1 (2d Cir. 2018) (citing *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d

479, 481 (2d Cir. 2011)).  In addition, the court considers written attachments to the complaint, as well as any statements or documents incorporated by reference.  *Id.*

## DISCUSSION

### I.  Unpaid Overtime

The FLSA "mandates that an employee engaged in interstate commerce be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week."  *Nakahata v. New York–Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) (citing 29 U.S.C. § 207(a)).  "[T]he relevant portions of New York Labor Law do not diverge from the requirements of the FLSA," and the pleading standards for FLSA overtime claims "apply equally to . . . NYLL state law claims."  *Dejesus v. HF Mgmt. Servs.*, LLC, 726 F.3d 85, 89 n.5 (2d Cir. 2013); *see also Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 465 n.2 (E.D.N.Y. 2015) ("Overtime claims under the FLSA and NYLL are subject to the same standards.") (citing *Dejesus*, 726 F.3d at 89 n.5).

#### A. Specific Workweek Requirement

Defendants assert that plaintiffs' overtime claims under the FLSA and NYLL are undone by plaintiffs' failure to allege a *specific* workweek in which they worked over forty hours and were denied overtime wages.  (Defs.' Mot. 5-6; Chan Mot. 3-4.)  "[I]n order to state a plausible FLSA overtime claim, a

plaintiff must sufficiently allege 40 hours of work in a given
workweek as well as some uncompensated time in excess of the 40
hours." *Lundy v. Catholic Health System of Long Island Inc.*,
711 F.3d 106, 114 (2d Cir. 2013).  "Determining whether a
plausible claim has been pled is a context-specific task that
requires the reviewing court to draw on its judicial experience
and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  The
Second Circuit later clarified that the claims in *Lundy* failed
"because of arithmetic: tallying the plausible factual
allegations, we could not get beyond forty hours in any given
week[.]" *Dejesus*, 726 F.3d at 88–89.  The Second Circuit has
also instructed that a plaintiff is "not required to keep
perfect time records or to plead its hours worked with
'mathematical precision.'" *Neil v. Sidney W. Barbanel
Consulting Eng'r LLC*, No. 12 CV 4061 SJ RLM, 2014 WL 3907909, at
*3 (E.D.N.Y. Aug. 11, 2014).

        The SAC is hardly a model of clarity, but plaintiffs
sufficiently state a claim for overtime violations under the
FLSA and NYLL.  Plaintiffs allege that Liu worked 7 days a week
until February 2017, and thereafter 6 days a week.  (SAC ¶ 78.)
The SAC further alleges that, throughout his employment, Liu
worked 85 hours a week during a 7-day workweek, and 75 hours a
week during the 6-day workweeks.  (*Id.* ¶ 79.)  The only time Liu
did not work over 40 hours a week were the periods from May 6-

19, 2017, and July 1-28, 2017.  (*Id.* ¶ 80.)  Gao likewise worked "6 days a week, over 75 hours a week," and the only time Gao did not work over 40 hours a week was the period from June 16 to July 12, 2018.  (*Id.* ¶¶ 85-86.)  According to the SAC, defendants "willfully failed to pay each plaintiff overtime pay for hours worked beyond 40 hours in a workweek . . . ."  (*Id.* ¶ 91.)  Accepting the truth of plaintiffs' allegations, and drawing all inferences in favor of plaintiffs, the court construes the SAC as alleging that plaintiffs invariably worked either 75 or 85 hours every week of their employment, except for the weeks specifically identified in the SAC.

Courts in this Circuit routinely find that similar allegations contain the requisite specificity to state a claim for unpaid overtime in violation of the FLSA and NYLL.  *See Kuck v. Planet Home Lending, LLC*, 354 F. Supp. 3d 162, 168 (E.D.N.Y. 2018) ("[T]he Second Amended Complaint alleges that the Plaintiffs worked 50-55 hours during every single week of their employment. . . . In other words, the Second Amended Complaint claims that every week between August 3, 2013 and July 22, 2017, for Kuck, and every week between October 13, 2014 and January 15, 2017, for Juliano, constitutes a 'given workweek' for which they are entitled to overtime pay."); *Smith v. Mercy Med. Ctr.*, No. 16-cv-1814, 2017 WL 3017194, at *6 (E.D.N.Y. June 6, 2017) ("Smith alleges that, despite working in excess of forty (40)

hours per week every week, Defendants only paid her for the
first forty (40) hours that she worked in violation of the FLSA
and NYLL. As Plaintiff alleges a specific number of hours in
excess of forty (40) that she worked every week, including the
number of days per week and month that she worked hours in
excess of those for which she was actually scheduled to work,
she plausibly alleges that she is entitled to unpaid overtime
compensation under the FLSA and NYLL."); *Shen v. John Doe Corp.*,
No. 16-cv-2015, 2016 WL 7217850, at *5 (S.D.N.Y. Dec. 13, 2016)
("[T]he complaint alleges that the plaintiffs worked thirty-two
hours of overtime and were not compensated for that time in
every week that they worked for the defendants . . . [T]he
complaint contains the specific language regarding numerous
weeks of uncompensated overtime that the Second Circuit found
lacking in *Lundy*."), *report and recommendation adopted*, 2017 WL
111746 (S.D.N.Y. Jan. 11, 2017); *Neil*, 2014 WL 3907909, at *4
("Because Plaintiff alleges to have worked up to 62 hours a
week, without any time off, each and every week, she has
established that she allegedly worked in excess of the forty
hour workweek, in violation of FLSA § 207(a)(1).").

        The facts presented here are also distinguishable from
the cases cited by defendants.  (Chan Mot. 10-11; Defs.' Mot.
6.)  Each such case involved overtime claims based on mere
generalizations of the amount of time worked, unlike the SAC,

which alleges that plaintiffs worked 75 or 85 hours every week with specific exceptions.[3]

### B. Individual Liability

Both motions to dismiss advance the argument that defendants, with the exceptions of Kueng Chan and Wing Keung, may not be held liable as employers under the FLSA and NYLL. The term "employer" under the FLSA includes "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C.A. § 203(d). To determine whether an individual is an "employer," the Second Circuit instructs courts to focus on the "economic reality" of the parties' relationship "rather than technical concepts."

---

[3]    *Fridman v. GCS Computers LLC*, 2018 WL 1581990, at *4 (S.D.N.Y. Mar. 27, 2018) (dismissing plaintiff's overtime claims where "the only allegations relating to overtime in the complaint are when Plaintiff alleges that he 'routinely' worked a total of ten or more hours over forty hours per week. Yet at no point in the complaint does Plaintiff allege *a single particular week* he worked more than forty hours or attempt to estimate the number of overtime hours he worked in any of the weeks employed."); *Serrano v. I. Hardware Distributors, Inc.*, No. 14-cv-2488, 2015 WL 4528170, at *4 (S.D.N.Y. July 27, 2015) (dismissing FLSA claims where two plaintiffs alleged the "average" hours worked per week because they constituted "conclusory assertion[s], without any supporting factual context," that they "worked some number of excess hours in some unidentified week."); *Johnson v. Equinox Holdings, Inc.*, No. 13-cv-6313, 2014 WL 3058438, at *4 (S.D.N.Y. July 2, 2014) (dismissing claim where plaintiff "typically worked between twenty one and fifty hours per week, with an additional three to four hours off the clock"); *Bustillos v. Acad. Bus, LLC*, 2014 WL 116012, at *3 (S.D.N.Y. Jan. 13, 2014) ("Mr. Bustillos's bare allegation that his schedule 'varied' and he 'would regularly work from 60 to 90 hours per week' is equivalent to the allegations in [similarly deficient overtime claims] in which the plaintiffs claimed they 'regularly worked' in excess of forty hours per week or did so during 'some or all weeks.'"); *Spiteri v. Russo*, No. 12-cv-2780, 2013 WL 4806960, at *56 (E.D.N.Y. Sept. 7, 2013) (dismissing case where "plaintiff has only generally alleged that '[d]uring the time relevant herein, Plaintiff worked approximately fifty (50) to (60) hours per week' and then alleged an aggregate number of hours worked on each case" because the plaintiff conceded he was paid, and thus the Court could not determine which hours were not paid and whether any unpaid hours qualify for overtime).

*Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop.*, Inc., 366 U.S. 28, 33 (1961)).  Four factors guide the analysis:

> whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  These factors are non-exclusive and no one factor is dispositive; a court is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003).

The NYLL defines "employer" similarly as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."  N.Y. Lab. Law § 190(3).  "Many courts in this Circuit have applied the economic realities test to determine 'whether an employer/employee relationship exists under the FLSA and the NYLL.'"  *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 922 (S.D.N.Y. 2013) (collecting cases); *but see Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013) (declining to rule on the plaintiff's contention that the tests for "employer" status are the same under the FLSA and NYLL because "this

16

question has not been answered by the New York Court of

Appeals.").[4]

Ultimately, the SAC provides minimal, yet sufficient

details to plausibly allege defendants Tong, Chan, and WK were

"employers" under the economic reality test established by the

Second Circuit in *Carter*.  Although defendants contend that the

SAC relies on formulaic recitations of the economic realities

test, sufficient facts are pleaded to survive defendants'

motions, except for the claims against Chen.  With respect to

the defendants in question, the SAC alleges as follows:

- **May Tong:** May Tong owns a 50% equity stake in Wing
  Keung.  (SAC ¶ 29.)  The SAC refers to her as the
  "boss lady" and alleges that she is "involved in the
  management of Wing Keung and WK," supervises the
  workers, and is responsible for employees' work
  schedules, compensation, and defendants' pay and
  recordkeeping practices.  (*Id.* ¶¶ 33-35.)

- **Simon Chan:** Chan, as the General Manager, "managed and
  oversaw" defendants' daily business activities, though
  the SAC neglects to clarify whether Chan performed
  these duties for Wing Keung, WK, or both.  (*Id.* ¶ 37.)
  Chan also purportedly designed and implemented
  defendants' "fraudulent labor practices."  (*Id.* ¶ 58.)

---

[4]     The New York Court of Appeals has stated that the "critical inquiry" in
determining whether an "employment relationship exists" under the NYLL
"pertains to the degree of control exercised by the purported employer over
the results produced or the means used to achieve the results."  *Bynog v.
Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (N.Y. 2003).  "Factors relevant to
assessing control include whether the worker (1) worked at his own
convenience, (2) was free to engage in other employment, (3) received fringe
benefits, (4) was on the employer's payroll and (5) was on a fixed schedule."
*Fenster v. Ellis*, 71 A.D.3d 1079, 1080, 898 N.Y.S.2d 582, 584 (N.Y. App. Div.
2d Dep't 2010) (quoting *Bynog*, 1 N.Y.3d at 198).  The analysis that follows
applies the economic reality test to plaintiffs' NYLL claims, but for the
avoidance of doubt, the court finds that defendants Tong, Chan, and WK are
employers under the criteria set forth in *Bynog*.

For example, Chan managed defendants' payroll department and was involved in the creation of fraudulent "employment records." (*Id.* ¶¶ 59-60.) Chan allegedly reviewed and finalized the employee's timesheets. (*Id.* ¶ 61.)

- **Feng Zhen Chen:** Chen is defendants' "other General Manager." (*Id.* ¶ 42.) Like Chan, he allegedly oversaw and managed defendants' general daily business activities and directly supervised plaintiffs' work. (*Id.* ¶ 43.)

- **WK:** The SAC does not overtly state that WK is plaintiffs' employer, but alleges that WK and Wing Keung "share manpower and resources," and related addresses. (*Id.* ¶¶ 14-15, 32.) Kueng Chan serves as CEO for both WK and Wing Keung. (*Id.* ¶ 27.) WK was also formed approximately two weeks before the Tang Judgment was entered, and, on plaintiffs' information and belief, was the transferee of at least some of defendants' assets. (*Id.* ¶¶ 25-26.)

In *Ayala v. Looks Great Services, Inc.*, Judge Spatt, elucidating the pleading requirements for FLSA and NYLL overtime claims, explained that:

the plaintiff must plead facts which make it plausible to infer that the individual defendant had authority take actions that satisfy some of the factors set forth in the economic reality test. As an example, the plaintiff could allege that the individual defendant did hire a *particular* employee; provide actual examples of authority exercised by the individual defendant that tended to show that he had operational control of the company; or plead allegations showing that the individual defendant was the sole decision-maker in a small or medium sized corporation. Any of these allegations would likely nudge FLSA and NYLL claims against individual officers of a company across the line from conceivable to plausible.

No. 14CV6035ADSSIL, 2016 WL 3541548, at *7 (E.D.N.Y. June 23, 2016) (internal quotation marks and citations omitted; emphasis in original).

The SAC pleads sufficient facts and actual examples of Tong and Chan exercising authority over defendants' employees, including plaintiffs.  Although plaintiffs do not explicitly allege that any of the above defendants had the power to "hire and fire employees," *Carter,* 735 F.2d at 12, the SAC and documents incorporated by reference make clear that Tong and Chan exercised significant control over Wing Keung's employees. Tong and Chan set schedules, maintained records regarding the employees' compensation and schedules, and Chan created false employment records and finalized time sheets.  According to the Tong Transcript, Tong asserted a degree of coercive authority of Wing Keung's employees.  For example, Tong hinted to Liu that "[y]ou will be going back to mainland China" if he did not drop his lawsuit, and suggested that the companies had incurred earlier labor violations "because we didn't want to report you guys" to tax enforcement authorities.  (Tong Tr. 1.)  These remarks can be reasonably be construed as an exercise of coercive authority, much less supervision, over Wing Keung's workforce.[5]

---

[5]     The transcript also contains revealing excerpts in which Tong conflates herself individually with Wing Keung.  (*E.g.*, *id*. 2 ("But you folks who have been with me for so many years know it very well.").)

The transcript also indicates that Tong played a role in determining the employees' "rate and method of payment," *see Carter*, 735 F.2d at 12.  (Tong Tr. 1 ("Are we giving him so little wages?"); *id.* 2 ("Each of you gets 4 checks, and receives the rest in cash, don't you? You all have signed for it.").) Chan also allegedly influenced the rate and method by which employees were paid, in addition to maintaining employment records, *see Carter*, 735 F.2d at 12, by overseeing the payroll department and by falsifying, reviewing, and finalizing timesheets, which were then passed along to Wing Keung employees by Grace Wong, presumably for the purpose of affecting and controlling employee pay.

Collectively, the "totality of the circumstances" strongly support the inference that Tong and Chan exercised material control over plaintiffs' conditions of employment. *See Kaplan v. Wings of Hope Residence, Inc.*, No. 218CV02972ADSAKT, 2018 WL 6437069, at *8-9 (E.D.N.Y. Dec. 7, 2018).  Common-sense also permits the reasonable inference that the vulnerable position of Wing Keung's employees, specifically their tenuous grasp of English, (*see* SAC ¶ 55), and, as Tong alluded to, potential tax liabilities, vested Tong and Chan, in their positions as co-owner and General Manager, with immense control over the Wing Keung labor force.  The court finds the facts alleged support the inference that Tong and Chan were

"employers" for purposes of the FLSA and NYLL due to the significant control they allegedly exercised over Wing Keung's employees.

The SAC also alleges that WK and Wing Keung operated as alter egos. "In the Second Circuit, alter ego liability is determined using a two-pronged test that asks (1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Garcia v. Paris Maint.*, No. CV15663SJFARL, 2016 WL 11481206, at *5 (E.D.N.Y. May 4, 2016), *report and recommendation adopted*, No. 15CV0663SJFARL, 2016 WL 3093895 (E.D.N.Y. June 1, 2016) (citations, brackets and internal quotation marks omitted); *see also Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 195 (2d Cir. 2010) ("Alter ego liability exists when a parent or owner uses the corporate form 'to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own.' ") (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (interpreting New York law)), *aff'd*, 133 S. Ct. 1659 (2013). "In deciding whether to pierce the corporate veil, 'courts look to a variety of factors, including the intermingling of corporate and [shareholder] funds,

undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors.'" *Kiobel*, 621 F.3d at 195 (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996)).

WK and Wing Keung allegedly functioned as a single economic entity.  Both entities shared the same CEO in Kueng Chan, shared manpower and resources, commingled assets, and maintained related addresses.  WK's genesis and function also raise questions as to whether it is an instrument to defraud judgment creditors.  WK was incorporated in 2017, on the eve of the Tang Judgment against Wing Keung and Kueng Chan.  WK's alleged receipt of defendants' assets, in addition to Tong's proclamation that she had transferred Wing Keung's assets with the express intention of frustrating plaintiffs' possible litigation recovery and thwarting existing debtors, indicates that WK was created for fraudulent ends.  The court finds that the circumstances alleged warrant disregarding the corporate form and treating WK and Wing Keung as a single entity for FLSA and NYLL purposes.

Because the SAC alleges that Tong, Chan, and WK are employers under the economic reality test, each party can be held individually liable for overtime and other labor violations under the FLSA and NYLL.  On the other hand, the SAC only alleges that defendant Chen was the "other General Manager" of Wing Keung, and that he exercised management and supervisory responsibilities over plaintiffs, but does not allege additional facts to support the claim that he was an "employer" with control over plaintiffs and other Wing Keung employees.  Even assuming, *arguendo*, that Chen was a transferee of assets fraudulently conveyed by Tong, as the SAC alleges, (*see* SAC ¶ 44), that is irrelevant to the issue of whether Chen exercised material control over plaintiffs' conditions of employment, or other factors under the economic reality test.  Accordingly, Chen cannot be held individually liable under the FLSA and NYLL.

### C. Timeliness

Plaintiffs' overtime claims appear to extend back as far as 2009, when Liu's employment at Wing Keung began.  The statute of limitations is six years under the NYLL and two years under the FLSA. *See* NYLL § 663(3); 29 U.S.C. § 255(a).  However, if an employer's acts are found to be "willful," the statute of limitations under the FLSA increases to three years. 29 U.S.C. § 255(a).  At this stage of litigation, plaintiffs' general assertions of willfulness, and specific allegations of prior

judgments for similar violations, satisfy the requirements of
pleading a willful violation of the FLSA, so as to invoke the
three-year statute of limitations.  *See, e.g.*, *Moran v. GTL
Const., LLC*, No. 06-cv-168, 2007 WL 2142343 (S.D.N.Y. July 24,
2007).

The SAC was filed on September 6, 2018.  The parties
agree that any overtime claims under the FLSA accruing prior to
September 6, 2015, or accruing prior to September 6, 2012 under
the NYLL, are time-barred.  (Chan Mot. 10; Defs.' Mot. 6-7; Opp.
11.)  The court dismisses any FLSA and NYLL claims arising prior
to the above dates.

## II.  Spread of Hours

Under New York law, when the spread of hours, *i.e.* the
period of time worked in a given day, exceeds 10 hours, an
employee must be paid "one hour's pay at the basic minimum
hourly wage rate," in addition to his otherwise-required wages.
*Villanueva v. 179 Third Ave. Rest Inc.*, No. 16-CV-8782 (AJN),
2019 WL 4744707, at *5 (S.D.N.Y. Sept. 30, 2019) (citing 12
NYCCRR § 142-2.4).[6]  Defendants contend that plaintiffs' spread
of hours claim fails because the SAC does not allege a

---

[6]     The complaint cites to 12 NYCCRR § 146-1.6, (SAC ¶ 122), but that
provision concerns spread of hours claims for hotel and restaurant workers,
and is inapplicable here.  The court assumes that plaintiffs are relying on
the more generally applicable spread of hours statute, 12 NYCCRR § 142-2.4.

particular day on which either plaintiff worked more than ten hours a day.  (Defs.' Mot. 6.)

Both Liu and Gao worked a minimum of 75 hours a week, every week, during their employment, with the exception of approximately six weeks for Liu and four weeks for Gao.  Simple arithmetic yields an excess of ten hours a day worked by each plaintiff during their average workday.  The SAC alleges that defendants willfully failed to make spread of hours payments for plaintiffs' working time in excess of ten hours.  (SAC ¶ 107(d).)  This sufficiently states a claim for spread of hours violations under the NYLL.  *See, e.g.*, *Perdomo v. 113-117 Realty, LLC*, No. 18 CV 9860 (VB), 2019 WL 6998621, at *6 (S.D.N.Y. Dec. 20, 2019) ("Here, plaintiff alleges he 'regularly worked ten (10) or more hours for three (3) days per week,' but defendants did not provide spread of hours compensation for these days.  Thus, plaintiff has adequately alleged he is owed an additional hour of compensation for each day he worked in excess of ten hours.") (record citation omitted).  Plaintiffs' spread of hours claim therefore survives, but is limited to violations occurring on or after September 6, 2012 pursuant to the NYLL's six-year statute of limitations.  In addition, for the reasons stated above, defendant Chen cannot be held individually liable for unpaid spread of hours compensation because he is not an "employer" under the NYLL.

### III.   WTPA Violations

Claim Four alleges that defendants failed to provide plaintiffs with "annual notices as required by the [WTPA]." (SAC ¶ 126.)  The WTPA requires employers to "provide [their] employees, in writing . . . a notice containing . . . the rate or rates of pay thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other allowances."  NYLL § 195(1).  Beginning April 9, 2011, the WTPA required employers to provide written wage notices "at the time of hiring, and on or before February first of each subsequent year of the employee's employment with the employer."  *Id.* § 195(1-a) (eff. Apr. 9, 2011 to Feb. 27, 2015).  A later amendment to the WTPA, effective February 27, 2015, modified the provision to require employers to provide written wage notices only "at the time of hiring," and not annually thereafter.  *See Cabrera v. Canela*, 412 F. Supp. 3d 167, 184 (E.D.N.Y. 2019) (citing 2014 N.Y. Laws ch. 537 § 1, amending NYLL § 195(1-a)); *Pest v. Bridal Works of New York, Inc.*, 268 F. Supp. 3d 413, 434 (E.D.N.Y. 2017) ("[T]he 2015 amendments eliminated the annual notice requirement and mandated that an employer only provide such notice 'at the time of hiring' and not for subsequent years.")(citation omitted).

Defendants argue that Liu, who was hired in 2009, before the WTPA took effect, is barred from asserting WTPA violations altogether.  (Chan Mot. 12; Defs.' Mot. 7-8.)  Though

it is true that the version of the WTPA effective April 9, 2011 did not have retroactive force, *see, e.g.*, *Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 631377, at *10 n.5 (S.D.N.Y. Feb. 12, 2015), *aff'd sub nom. Azkour v. Little Rest Twelve, Inc.*, 645 F. App'x 98 (2d Cir. 2016) ("[T]he WTPA was not meant to be applied retroactively . . . ."); *Quintanilla v. Suffolk Paving Corp.*, 2012 WL 4086805, *3-5 (E.D.N.Y. Sept. 17, 2012); *Zubair v. EnTech Eng'g P.C.*, 900 F. Supp. 2d 355, 360 n.3 (S.D.N.Y. 2012), it does not follow that Liu's WTPA is foreclosed if defendants neglected to provide him with the required annual notice.  Liu may not assert claims for WTPA violations that accrued prior to April 9, 2011, but he was employed well after that date.  Thus, Liu plausibly states a claim for defendants' failure to provide annual notices on or before February 1, 2012, 2013, 2014, and 2015, until the annual notice requirement was stricken.  *See Kim*, 2015 WL 2222438, at *32.  The alleged 2012 violation, however, would have pre-dated September 6, 2012, and is time-barred by the NYLL's six-year statute of limitations.  *See* N.Y. Lab. Law § 198(3).  As for Gao, he commenced employment with defendants on March 7, 2017. (SAC ¶ 81.)  He was thus entitled to a notice under NYLL § 195(1)(a) "at the time of hiring," but not thereafter. Accordingly, defendants' motion to dismiss the SAC's WTPA claims is denied in part, and granted in part.  Plaintiffs are entitled

to discovery for alleged WTPA violations under NYLL § 195(1) in 2013, 2014, and 2015 with respect to Liu, and in 2017 with respect to Gao.  In addition, plaintiffs may not seek relief against Chen for the reasons explained above.[7]

    The SAC also includes a stray reference to NYLL § 195(3), and alleges that defendants failed to provide plaintiffs with "weekly wage statements."  (SAC ¶ 127.)  NYLL § 195(3) requires employers to "furnish each employee with a statement with every payment of wages," listing detailed information including "the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof . . . gross wages; deductions; allowances . . . and net wages."  If a plaintiff-employee proves that her employer failed to provide timely paystubs, she is entitled to "two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."  NYLL § 198(1-d).  Defendants argue that the SAC fails to state a claim under NYLL § 195(3) because the statute merely requires a wage statement with "every payment of wages," not weekly statements.

---

[7]    The court's determination that Chen is not an "employer" for the purposes of the FLSA and NYLL, and therefore may not be held individually liable for Claims One through Four, does not spare him of potential liability for Claims Five through Nine, to the extent those claims survive.

(Defs.' Mot. 8.)   The SAC alleges, however, that Gao and Liu were paid weekly beginning in 2017, which the court must accept as true.   (SAC ¶¶ 76, 81-84.)   Therefore, if defendants failed to furnish plaintiffs with weekly wage statements, they would have necessarily failed to provide wage statements with "every payment of wages," as required by NYLL § 195(3).   On the other hand, Gao did not begin working for defendants until 2017, and Liu does not allege that he was paid weekly before 2017.   Even if defendants' did not provide Liu with weekly wage statements prior to 2017, the court cannot assume that defendants did not provide wage statements at some other interval, which may or may not have corresponded with Liu's regular pre-2017 pay period. The claim under NYLL § 195(3) therefore survives, but is limited to violations occurring on or after 2017, when Liu and Gao received weekly wage payments.   The court will not speculate whether defendants failed to provide Liu with timely pay stubs before 2017.

## IV.   Fraudulent Conveyances

Claim Five is a generic claim for "Fraudulent Conveyance."   The paragraphs setting forth the cause of action do not reference specific authority and the court is unaware of any cause of action for fraudulent conveyance under New York common law that has not been superseded by the statutory provisions of the NY DCL.   The court therefore dismisses Claim

Five and proceeds to plaintiffs' remaining claims under the NY
DCL.

Counts Six through Eight assert claims for
constructive fraudulent conveyance under NY DCL sections 273
through 275.  "Under the DCL, a conveyance by a debtor is deemed
constructively fraudulent if it is made without 'fair
consideration,' and (inter alia) if one of the following
conditions is met: (i) the transferor is insolvent or will be
rendered insolvent by the transfer in question, DCL § 273; (ii)
the transferor is engaged in or is about to engage in a business
transaction for which its remaining property constitutes
unreasonably small capital, DCL § 274; or (iii) the transferor
believes that it will incur debt beyond its ability to pay, DCL
§ 275."  *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir.
2005).  A constructive fraudulent conveyance action cannot be
sustained absent adequate allegations that the transaction in
question lacked "fair consideration."  *See Atlanta Shipping
Corp., Inc. v. Chem. Bank,* 818 F.2d 240, 248 (2d Cir. 1987) ("An
essential element of a claim pursuant to DCL §§ 273, 273-
a, 274, 275 is lack of fair consideration.").  Fair
consideration "is profitably analyzed as follows: (1) . . . the
recipient of the debtor's property[ ] must either (a) convey
property in exchange or (b) discharge an antecedent debt in
exchange; and (2) such exchange must be a 'fair equivalent' of

30

the property received; and (3) such exchange must be 'in good faith.'" *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1058–59 (2d Cir. 1995) (emphasis omitted).  "Constructive fraudulent conveyance claims . . . do not require the intent to defraud as an element," and therefore, "are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b)," although they "cannot survive a motion to dismiss on conclusory allegations alone." *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 667 (S.D.N.Y. 2012).

Count Nine of the SAC seeks recovery pursuant to NY DCL § 276, New York's intentional fraudulent conveyance statute, which provides that "[e]very conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  NY DCL § 276.  To survive a motion to dismiss on an actual fraud claim, "a plaintiff must allege that a defendant acted with actual intent to hinder, delay, or defraud creditors and must plead its allegations with particularity as required by Fed. R. Civ. P. 9(b)." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 797 (S.D.N.Y. 2017) (internal quotation marks and citation omitted). Due to the difficulty of providing intent, actual intent may be established through "badges of fraud," or "circumstances so commonly associated with fraudulent transfers that their

presence gives rise to an inference of intent." *Sharp*, 403 F.3d
at 56 (citing *Wall St. Assocs. v. Brodsk*y, 684 N.Y.S. 2d 244,
247 (1st Dep't 1999)). "The badges of fraud consist of the
following: (1) a close relationship between the parties to the
alleged fraudulent transaction; (2) the inadequacy of
consideration; (3) the transferor's knowledge of the creditor's
claims and the transferor's inability to pay them; (4) the
retention of control of the property by the transferor after the
conveyance; (5) the fact that the transferred property was the
only asset sufficient to pay the transferor's obligations; (6)
the fact that the same attorney represented the transferee and
transferor; and (7) a pattern or course of conduct by the
transferor after it incurred its obligation to the
creditor." *Rosa v. TCC Commc'ns, Inc.*, No. 15CV1665, 2017 WL
980338, at *4 (S.D.N.Y. Mar. 13, 2017) (citation omitted).

Turning first to the constructive fraud claims, the
SAC adequately pleads facts to support an action under sections
273 through 275 of the NY DCL against the defendants.  The
wellspring of plaintiffs' claims is a conversation between Tong
and Liu that allegedly took place after the instant suit was
filed.  Liu recorded and then memorialized his exchange with
Tong in a transcript that the court assumes is true for the
purposes of the motions to dismiss. (SAC ¶¶ 66-73.)  Tong's
statement that "we"—which the court construes as the defendants—

"have already transferred all our assets" to Chen and others, and that the transfer had left defendants with "nothing," establishes a lack of fair consideration.  (*See* Tong Tr. 1.) Tong's remark that defendants' post-transfer assets amounted to nothing also plausibly supports that the transfers had rendered defendants insolvent, *see* NY DCL § 273, with unreasonably small capital, *see id.* ¶ 274, and unable to pay their debts, including the Kong and Tang Judgments, and the contingent debt arising from plaintiffs' suit, *see id.* § 275.  (*See, e.g.*, Tong Tr. 1 ("Regarding this case, we have already transferred all our assets and none of them is under my name. Even if you won the case in the end, you could only win reputation."); *id.* ("If [your lawyer] wins the case, I might as well file bankruptcy. If I don't have anything in the United States, what are you suing me for?").)

        The SAC also states a claim for intentional fraudulent transfer.  The transfers invoke at least two badges of fraud: the transfers of defendants assets were made for little or no consideration, and Tong knew that by transferring all of defendants' assets, she was thwarting the claims of judgment creditors, both future and present.  In fact, Tong's brazen admission, which if proven true constitutes crystal clear evidence of fraudulent intent, renders a badges of fraud inquiry unnecessary.  Assuming the truth of the Tong Transcript, Tong

33

unequivocally admitted that she and others transferred "all"
assets to Chen, among others, for the express purpose of
rendering futile plaintiffs' litigation efforts and to limit any
potential recovery to "reputation" alone.  (*See generally* Tong
Tr.)  Tong also boasted that the transfers would deprive the
Kong Litigation plaintiffs of their rightful award.  (*Id.* 1
("Jun Kong hasn't got the money yet.  Don't think that Jun
Kong's case was lost.").)  The court finds that Tong's
statements that defendants transferred "all" of their assets to
hinder, delay, and defraud their judgment creditors provide the
requisite specificity to surpass Rule 9(b)'s pleading hurdle for
intentional fraudulent transfer claims.

Defendants' motions to dismiss Claims Six through Nine
of the SAC are denied.

## V.  Motion to Strike

Defendants also move to strike plaintiffs' demand for
prejudgment interest under the FLSA.  (Defs.' Mot. 12; *see* SAC ¶
I.)  Plaintiffs concede that a plaintiff cannot recover both
liquidated damages and prejudgment interest under FLSA.  (Opp.
15); *see Hernandez v. Jrpac Inc.*, No. 14 CIV. 4176 (PAE), 2016
WL 3248493, at *35 (S.D.N.Y. June 9, 2016) ("Under the FLSA, . .
. liquidated damages have also been held compensatory, and
therefore, '[i]t is well settled that in an action for
violations of the [FLSA] prejudgment interest may not be awarded

in addition to liquidated damages.'") (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) (per curiam)). The NYLL, however, expressly authorizes the recovery of prejudgment interest alongside liquidated damages.  *Hernandez v. Jrpac Inc.*, No. 14 CIV. 4176 (PAE), 2016 WL 3248493, at *35 (S.D.N.Y. June 9, 2016) (citing N.Y. Lab. Law § 198(1-a) ("[T]he court shall allow [an] employee to recover . . . prejudgment interest as required under the civil practice law and rules, and, unless [the employer proves good faith], an additional amount as liquidated damages . . . .")).  On reply, defendants acknowledged that New York law allows recovery of liquidated damages and prejudgment interest for New York labor law violations and informed the court that their motion to strike prejudgment interest was withdrawn.  (Defs.' Reply 7.)

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are GRANTED in part, and DENIED in part.  Defendants' motions to dismiss plaintiffs' claims for fraudulent conveyance under New York Debtor and Creditor Law, Claims Six through Nine, are DENIED.  Claim Five is DISMISSED because it is superfluous and duplicative of Claims Six through Nine.  Claims One through Four of the SAC are DISMISSED with respect to defendant Feng Zhen Chen.  Counts One, Two, and Three are further DISMISSED to the extent plaintiffs assert any Fair Labor Standards Act

violations pre-dating September 6, 2015, or New York Labor Law violations pre-dating September 6, 2012.  Defendants' motions to dismiss Count Four are DENIED, to the extent plaintiffs assert violations of New York Labor Law section 195(1) for plaintiff Jian Cheng Liu in the years 2013, 2014, and 2015, and for plaintiff Fuqiang Gao in the year 2017, and for violations arising under New York Labor Law section 195(3), on or after 2017.  Except as stated above, defendants' motions to dismiss are DENIED.  The parties shall proceed to discovery and are hereby referred to Magistrate Judge Bulsara for all pre-trial matters.

**SO ORDERED.**

Dated:   February 28, 2020
         Brooklyn, New York

                              _____
                                        /s/
                              **Kiyo A. Matsumoto**
                              United States District Judge